## Case No. 13,339.

### STEARNS v. PAGE.

[1 Story, 204.] [1]

Circuit Court, D. Maine. May Term, 1840.

PLEADING IN EQUITY—PLEA AND ANSWER—STATUTE OF LIMITATIONS—LACHES.

1. Where a bill in equity was brought by an administrator de bonis non, for an account of the intestate's estate, after the lapse of from twenty to twenty-five years, and the defendant pleaded the statute of limitations, and filed a general answer to the whole bill; it was held, that the plea should, in itself, contain averments, negativing such special matters, stated in the bill, as would, if true, avoid the operation of the statute; and that it was not sufficient, that such matters were negatived in the answer.

[Cited in Lemoine v. Dunklin Co., 38 Fed. 570.]

2. When an answer contains more than is strictly applicable to the support of the plea, it overrules the plea.

[Cited in Dakin v. Union Pac. Ry. Co., 5 Fed. 667; Hayes v. Dayton, 8 Fed. 706.]
[See Steiger v. Heidelberger, 4 Fed. 455.]

3. Where a bill in equity is brought after a great lapse of time, it is incumbent on the plaintiff to state the reasons, why it was not brought before, in order to repel the presumption of laches or improper delay; and if fraud, mistake, &c. are charged, distinct and definite averments should be made in regard to the time, occasion, and subject matter of such fraud or mistake.

[Cited in Greene v. Bishop, Case No. 5,763. Quoted in Hardt v. Heidweyer, 152 U. S. 547, 14 Sup. Ct. 674.]
[Cited in Clark v. Potter, 32 Ohio St. 61; Ogden Paint, Oil & Glass Co. v. Child (Utah) 37 Pac. 737.]

Bill in equity, brought by George B. Stearns, of Boston, as administrator de bonis non of John O. Page, against Rufus K. Page.

The bill alleges, in substance, as follows: That John O. Page died in foreign parts, about the 28th of February, 1811, intestate, and possessed of real and personal estate to the amount of about $81,000; that he left a widow, who, on the 25th of June, 1811, was appointed his administratrix; that, during his absence, the management of most of his personal property was intrusted to Ru-

[1] [Reported by William W. Story, Esq.]

fus K. Page, and, after his death, his widow being unacquainted with business transactions, it was continued in his care, together with all the residue of his personal property, as trustee. That the accounts rendered by the widow, as administratrix, the last of which was rendered on the 20th of February, 1816, were in reality drawn up by Rufus K. Page, and signed by her as a mere matter of form, and were full of errors and mistakes

The bill further charges, that Rufus K. Page, as trustee, fraudulently appropriated and converted to his own use certain portions of the property, viz.: 1st. That he sold the brig Emmeline for the sum of $13,000, and converted the whole proceeds of the sale to his own use, without ever rendering any account of them. 2d. That he falsely represented to the administratrix, that a copartnership had existed between John O. Page and himself, by which he was entitled to a portion of the goods in the store of J. O. Page, in Hallowell, as well as of a portion of the credits belonging to the establishment; while, in fact, no such copartnership had ever existed, and the whole merchandise credits of the store were the sole property of John O. Page. 3d. That he induced the administratrix, by false and fraudulent representations, to give up, without consideration, certain promissory notes due from him to the estate of John O. Page. 4th. That, as trustee, at the death of John O. Page, he came into possession of the ship Horatio, which was then unfinished, and on the stocks; and that his duty was to sell the ship, and pay over the proceeds to the administratrix; but, in breach of his trust, he grossly and fraudulently neglected so to do, and suffered the vessel to deteriorate and decay, until she became of little or no value, so that the estate lost the proceeds and benefits, which should have accrued from such sale; and that the ship Horatio might and could have been sold for the sum of $12,000. The bill further states, that the administratrix, Sarah Page, died in 1836, and that the plaintiff, on the 28th of October, 1828, married Louisa Page, the daughter of Sarah Page, then of age, and that he was appointed administrator de bonis non of the estate of John O. Page. The bill goes on to charge: 5th. That Rufus K. Page has admitted to several persons, that he had property in his hands, which he had appropriated, and claimed to hold by virtue of a certain paper, purporting to be the will of John O. Page; but that, in fact, such paper, on being offered for probate, was set aside as invalid; and that J. O. Page therefore died intestate. That he has also declared, that he made sales of John O. Page's property, among which was a sale of the brig Emmeline, for $13,000, the proceeds of which he converted to his own use. That prior to the death of John O. Page, the defendant had apparently been possessed of scarcely any property; but that,

with the proceeds of this fraudulently converted property, he had entered largely into business, and received large profits therefrom, for which he ought to account, as trustee. 6th. That from the nature of the transactions and lapse of time, the plaintiff has not full information relative to the other parts of the accounts of the property, but believes and avers, that it was fraudulently appropriated and converted to the use of Rufus K. Page. That since the winter of 1834, the plaintiff had no suspicion of a breach of trust, or that the accounts were erroneous, and that he had not until recently obtained sufficient information to authorize him to proceed against Rufus K. Page. That once, when applied to, Rufus K. Page agreed to submit the whole matter to the decision of some disinterested person, but that when requested to carry such agreement into effect, he absolutely refused so to do. And that a further proposal has been made to him to investigate the accounts between him and J. O. Page, and between him and the administratrix; with which he refuses to comply.

The bill prays, that the said Rufus K. Page may answer the premises and render an account of all the matters therein contained, and a full statement and account of all the property of the said John O. Page, at the time of his death, and of all the property, that ever came into the possession or control of the defendant, or of any person, subject to his directions, as trustee; and that he shall pay to the plaintiff whatever may be due on a fair settlement of the accounts subsisting between him and the estate of the said John, going back to the time of the said John's death, and making examination of all accounts, with interest on all sums due from the defendant, and it concludes with the prayer for general relief.

The defendant pleaded the statute of limitations, and also made answer, in substance, as follows: That he believes, that John O. Page died intestate, in foreign parts, in manner as stated in the bill, and that Sarah Page was appointed administratrix. That after such a lapse of time, he is unable to specify particularly the property, which the said intestate left. But believes, that an inventory was returned by the administratrix of all his real and personal estate to the sum of between $70,000 and $80,000, which is now on file in the office of the register of probate, for the county of Kennebec. That John O. Page was for some time in the business of building and sailing vessels, but his business having considerably increased, and he being feeble in health, he proposed in May, 1806, to take the defendant, who had been formerly a clerk in the store, into copartnership. The proposal was assented to, and the copartnership was formed without written articles of agreement, but verbally and without limitation of time. The agreement was, that the stock owned by the said

John and already in the store, should be turned in, as a part of the capital of the firm, which was to be under the name of Rufus K. Page. An inventory of the stock was taken, and it amounted to the sum of $1013.-36, which was entered to the credit of the said John. It was agreed also, that he should add thereto $2,000 as a part of the capital, which was accordingly done. The care and labor was to devolve upon the said Rufus K. The profits were to be divided in the proportion of five eighths part to the said John, and three eighths to the defendant; and the said John was to have the privilege of reserving and advising in relation to the business. The defendant, in May, 1806, commenced and prosecuted the business, according to the terms of the agreement, from that time until the death of the said John dissolved the copartnership. That the said John was in the habit of frequenting the store, and inspecting the books. That, by agreement, whatever goods were taken by either were charged to his account. The business was profitable; but no settlement was made before the death of the said John. That besides the business of the store, the said John was extensively employed with sundry persons, distinct from the firm, in the building of vessels; and that in the year 1809, jointly with Caleb Stevens, now deceased, and the defendant, he built the brig Emmeline, and fitted her for sea in 1810, he owning one half, and the said Stevens one 'fourth, and the defendant one fourth, which were paid for by them respectively. Besides this, that the defendant attended to other business of the said John, not connected with the store; to wit, the said John contracted with the said Stevens to build the Horatio, afterwards called the Albert Gallatin, of which the said John was the owner of three fourths, and Albert Stevens of the other one fourth, and which was unfinished when the said John left this country; and that the care and business of building the said vessel devolved on the defendant. But that he was, in no wise, the trustee of the said John, except as a copartner, and in advising and aiding his wife in the management of his business; that Sarah Page was appointed administratrix, and the will, which was set aside, bequeathed to him, in consideration of his services, as he supposed, the interest of the said John in the Horatio; but that he does not rely upon the will, inasmuch as it was set aside.

The defendant further states, that in returning an inventory of the goods and estate of the said John, all his personal estate was included, as he believes. That on the 19th of October, 1811, the said administratrix, by the advice of her father-in-law, the late Nathaniel Dummer, and of the late Thomas Bond, Esq., her brother-in-law, and of the late Chandler Robbins, Esq., the intimate friend of her late husband, as well as of herself and family, sold to the defendant, the

share of the brig owned by her intestate, being one half part, for $3,000, according to the best of his recollection; and a bill of sale was made to him and dated October 19th, 1811, which he is ready to produce, and for which he made payment. That he owned the vessel until the year 1816, when he sold her for the nominal sum of $8,000, receiving bank bills, then at a discount, in payment, and that the said defendant believes the administratrix consulted her best interest in such sale, inasmuch as during the year, that he owned the vessel, the restrictions of commerce and the ensuing war with Great Britain kept her out of employment, and many expenditures were necessary in repairs. That all money, or goods, furnished by the said John were duly credited to him on the books, unless a note was given by the defendant; and when that was the case, the note was not retained in the store, nor ever after in his possession, until paid by him. And that all money and goods advanced to the said John were charged to him in the said books, from May, 1806, until his death, in February, 1811. That when the said John left the country, the debit side of his account was about $26,-000, and the credit side $24,000; that he continued to see the books until he left the country. That in February, 1812, the administratrix, by the advice of her counsel, Thomas Bond, Esq., appointed John Agry, of Hallowell, a merchant and ship-holder, and the said Chandler Robbins, her agents, to make a settlement of all accounts between her and her intestate and the defendant. That the settlement, which he believes to be correct, allowed the defendant a balance of between $8,000 and $9,000, principally arising from disbursements and supplies made by the defendant in building the said ship, after the said John left the country. That in payment, the defendant set off certain notes of his held by the administratrix, and for the balance gave the said administratrix the note for $3870.50, which was written and witnessed by the said Chandler Robbins, and which the defendant has paid, and now has in his possession. That these are the notes referred to in the bill, and the only ones, that were due from him.

The defendant further answers, that the accounts rendered by the administratrix were made out principally, if not wholly, by the said Chandler Robbins, with the advice of her counsel, T. Bond, Esq., and her father-in-law, Nathaniel Dummer; and all the information required of this defendant was truly and faithfully given, and no error was ever caused by him, by withholding, or causing to be withheld, any property, which ought to have been accounted for, and he supposes, that all such property was accounted for. That the Horatio received his strictest care and attention, until she was launched, which could not be done until the year 1811. That the administratrix desired to sell the vessel, and the defendant advised her so to do, and

endeavoured to aid her in selling it, though it was no part of his duty; but she could not. That the war with Great Britain, in 1812, suspended all commerce, and many ships decayed at the wharves. That in 1816, Jacob Barker offered to purchase the vessel, and to give payment in treasury notes, which were at a great discount, which proposal the administratrix declined; and that Israel Thorndike, Esq., of Boston, in about 1811, offered to purchase one half of the said vessel, and pay therefor in sails and rigging for her, which was declined. These were the only offers made. The vessel remained at Bath till 1816, when she was launched, and in the intermediate time, all care was bestowed upon her. In 1816, Barker made another offer to buy one half, and pay in rigging and sails for her, which the administratrix finally accepted. The sails and rigging were furnished, and the vessel set sail for New York, and on her passage leaked very much. When she arrived there, she was so rotten, that she could not be caulked, and she was also found defective in her upper works. Barker here offered $5,000 for the second half of the vessel, which proposal the administratrix, after advising, accepted; and that the bill of sale was made, and the consideration paid to the defendant, who paid it over to the said administratrix. The defendant wholly denies, that he acted neglectfully or fraudulently with regard to the sale of the said vessel, and says, that he never had an offer of $12,000. He also denies, that he has admitted within six months, that he claimed any portion of the property of the said John O. Page by virtue of the said John's will. He also denies, that he ever declared, that he sold any property of the said intestate, the proceeds of which he did not account for to the said administratrix; and he denies, that he ever said, that he sold the brig Emmeline for $13,000; though it was no concern of the administratrix, he having bought all her interest in the same; and that he made no extension of his business until four or five years after the death of the said intestate.

The defendant further answers, that the plaintiff had ample opportunity to examine into the affairs of the said estate, ever since his marriage, in 1828. That he was familiar with the business of merchandise and the subject of merchant's accounts, and was frequently at Hallowell, and always had free access to the papers of the said administratrix and the books of the firm; but that no complaint was ever made, until after the bankruptcy of the said complainant, which was about a year since.

The cause was shortly spoken to by Allen, in support of the plea, and by Robinson against it; but the court intimated, that the plea was unsustainable in its actual form.

STORY, Circuit Justice. It does not appear to me, that the learned counsel need trouble themselves to argue at large the point, as to the sufficiency of the plea. I will merely intimate the difficulties attending it; and will then hear them, if there be any remaining doubts on their minds. I am the more ready to do this, because proceedings and pleadings in equity are not as yet familiarly known to the profession in this district; and, therefore, it may not be useless also to suggest, that the bill itself seems to require amendments and alterations before it can be held valid as the ground for a decree.

First, then, as to the plea. It is a dry, naked plea of the statute of limitations, without any averments, negativing the special matters set up in the bill, which, if true, would avoid the operation of the statute. I take it to be clear, that the plea should contain in itself such averments; and the answer in support thereof should also contain a full discovery of the matters so set up in avoidance of the bar. It is not sufficient for the answer alone to negative such matters; for it is mere matter of discovery; but the plea should in itself, if true, contain a complete bar. This will be found stated at large by Lord Redesdale, in his excellent work on Equity Pleadings. Mitf. Eq. Pl. (by Jeremy, 4th Ed.) 239–243; Story, Eq. Pl. §§ 680–687, 754. The same doctrine was affirmed by Lord Cottenham, in Foley v. Hill (3 Mylne & C. 475), according to my understanding of the true import of his lordship's judgment.

Now, in the present case, there are various averments in the bill, which touch the validity of the bar of the statute. First, it states, that there were fraudulent representations made to the original administratrix of a partnership between the intestate and the defendant, which had no existence; secondly, a fraudulent sale made by the defendant of the brig Emmeline; thirdly, negligence and misconduct in the sale of the ship Horatio; and fourthly, the bill alleges certain declarations and admissions of the defendant within six months, which acknowledge, that he still has assets of the intestate in his hands. None of these allegations are in the slightest degree alluded to, or negatived in the plea. And, perhaps, it will also be found, that a single plea of the statute, with a negative of all these matters, would not be valid on account of their various nature; but that there should be distinct pleas and distinct answers severally to each of them, since they involve, or may involve, very different equities, as well as very different proofs.

Again. The plea is general, that the action accrued more than six years ago. But to whom it accrued, is not said. Now, the original administratrix died in 1826; and the present administrator de bonis non was not appointed until 1834, within six years of the filing of the plea. It is not said, that the cause of action accrued six years before the original administratrix died, or six years before the present bill was brought.

Again. The answer covers much more matter, than is strictly applicable to the mere

support of the plea. When the answer includes more than is necessary for such a purpose, it overrules the plea, and must so be held at the argument. A plea states some ground, why the defendant should not go into a full defence. Mitf. Eq. Pl. (by Jeremy) 298, 299; Story, Eq. Pl. §§ 688, 693. But if the answer goes into a full defence, that necessarily overrules it. In the present case, the answer, among other things, not strictly responsive to the matters, charged by the bill to repel the statute of limitations, goes on to set up a distinct defence of an account settled between the original administratrix and the defendant, in 1812, which it insists was conclusive, as to some of the matters, in respect to which relief is sought.

Upon these grounds, it seems to me, that the plea ought to be overruled. But there are also objections to the allegations of the bill in its present structure. I suggest some of them for the consideration of counsel.

The bill is brought by an administrator de bonis non against the defendant for an account of the intestate's estate. (1) For moneys and property of the intestate received in his lifetime. (2) For moneys and property of the intestate, received by him as agent of the former administratrix in her lifetime. The bill also makes a distinct claim for losses occasioned to the estate and to the administratrix by his negligence and misconduct in his agency. The intestate died in 1811. Administration was taken by his widow in 1812. The administratrix died in 1826. The present plaintiff was appointed administrator de bonis non in 1834. The bill is, therefore, brought for an account after a great lapse of time; and, as courts of equity never entertain any bills of this sort, where there has been negligence or laches in the party, it is incumbent upon the plaintiff to set up in his bill, the reasons, why the bill was not brought at an earlier period, in order to repel the presumption of laches or unreasonable delay. If the case turns upon fraud, mistake, concealment, or misrepresentation, the bill should state, what, in particular, the fraud, mistake, concealment, or misrepresentation was, and how, and in what manner it was perpetrated. General allegations, that there has been fraud, or mistake, or concealment, or misrepresentations, are too loose for purposes of this sort. The charges must be reasonable, definite, and certain as to time, and occasion, and subject matter. And especially must there be distinct averments of the time, when the fraud, mistake, concealment, or misrepresentation was discovered, and how discovered, and what the discovery is; so that the court may clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made. For, if by such diligence the discovery might have been before made, the bill has no foundation on which it can stand in equity, on account of the laches.

Now, for all purposes of this sort, the bill is exceedingly loose, and vague, and defective. (1) The bill asserts a claim against the defendant for the brig Emmeline, sold after the death of the intestate by the defendant, belonging in whole or in part to the intestate, but which, it alleges, the defendant converted wholly to his own use. The time of the sale is not mentioned, nor whether under the agency, or with the consent of the administratrix, or not, or whether sold in her lifetime, or not. And yet it is almost a necessary inference, that the sale was in her lifetime, and with her consent; and no reason is assigned, why she did not receive the proceeds, or such as belonged to the intestate. (2) The bill also charges, that the defendant had received property of the intestate, under a false allegation of partnership with the intestate, and had not accounted for it. It is not stated with certainty, when the property was received; but it must have been in the time of the administratrix. It is not stated, that the administratrix had not the full means to inquire into, and to ascertain all the facts in her lifetime. Nor is it formally stated, in positive terms, that there was a fraudulent concealment of any particular facts; nor when the discovery, if any, was first made of the real facts; nor how, or in what manner, or by whom. (3) The bill also charges, that notes of the intestate, to the amount of $11,000, were delivered up by the administratrix to the defendant, without payment or consideration, upon fraudulent representations. But it is not stated, when they were so delivered up; nor what in certainty the fraudulent representations were; nor when the fraud was first discovered, nor by whom, nor in what manner; nor whether, upon due diligence and inquiry, it might not have been fully ascertained long ago. (4) The bill also charges, that the ship Horatio, which was partly built in the intestate's lifetime, and was finished after his death, was sold by the defendant, as agent of the administratrix; and that by his negligence and misconduct in his agency, a great loss was thereby sustained. Now, if there was any wrong done to the estate in this particular, it was a wrong done by the agent of the administratrix, for which he would be personally liable to her, and she to the estate. But, as her agent, the defendant stood in no privity or connexion with the estate, so as to be responsible for such misconduct or negligence to any succeeding representative of the estate. How can an administrator de bonis non maintain a suit in law or equity against an agent of the former administratrix, for a violation of his duty to the latter in his agency? It is not a contract with the intestate; but a mere personal contract with the administratrix. There is no privity in such a contract between the administrator de bonis non and the defendant. The allegation of negligence and misconduct, is also stated with great looseness. It is not said in what the negligence or misconduct consisted. (5) Then, again, the bill charges,

that the plaintiff took administration de bonis non in 1834; and in very general terms alleges, that he did not learn the facts fully until recently, after making inquiries. But the bill does not state, what particular discoveries have been obtained, or when they were obtained, or by what inquiries, or in what manner, or at what time; nor whether the same sources of inquiry were not fully open and well known to the administratrix in her life-time, and might not then have been equally successful. Indeed, so far as can be gathered from the imperfect allegations of the bill, all the facts and acts, now relied upon as grounds of relief, took place in the time of the administratrix, and many years before her death.

Under such circumstances, after such a lapse of time, it being between twenty and twenty-five years after the alleged transactions took place, and ten years after the death of the administratrix, the court have a right to require, before the bill is entertained, that a clear case should be made out, upon the very face of the bill, calling for its interposition; and showing that the parties in interest have been guilty of no negligence or undue delay, in not applying for relief at an earlier period.

After this expression of the opinion of the court, the defendant asked leave to withdraw his plea, and the plaintiff asked leave to amend his bill, which were accordingly allowed by the court.

[Several amendments were subsequently filed, when, in 1843, the bill was dismissed. An appeal was then taken to the supreme court, where the decree of the circuit court was affirmed. 7 How. (48 U. S.) 819.]